**UNION MECHLING CORPORATION et al., Plaintiffs,**

**and**

**Igert, Inc., et al., Intervening Plaintiffs,**

**v.**

**The UNITED STATES of America and the Interstate Commerce Commission, Defendants,**

**and**

**Sioux City and New Orleans Barge Lines, Inc., Intervening Defendant.**

**Civ. A. No. 73–956.**

United States District Court,
W. D. Pennsylvania.
Nov. 26, 1974.

**414**

Richard L. Thornburgh, U. S. Atty., W.D.Pa., Pittsburgh, Pa., John H. D. Wigger, Dept. of Justice, Washington, D. C., for U. S.

H. G. Homme, Jr., I. C. C., Washington, D. C., for I. C. C.

Donald Macleay, Macleay, Lynch, Bernhard & Gregg, Washington, D. C., S. S. Eisen, Eisen & Mitchell, New York City, for Union Mechling Corp.

Edward K. Wheeler, Wheeler & Wheeler, Washington, D. C., for Sioux City and New Orleans Barge Lines, Inc.

Richard J. Hardy, Hardy & Chapman, Washington, D. C., for Federal Barge Lines, Inc., Gulf-Canal Lines, Inc.

Harry C. Ames, Jr., Ames, Hill & Ames, P. C., Washington, D. C., for American Commercial Barge Line Co., Coyle Lines Inc. and The Valley Line Co.

John C. Lovett, Lovett & Lewis, Benton, Ky., for Igert, Inc.

Thomas M. Auchincloss, Jr., Rea, Cross & Knebel, Washington, D. C., for Arrow Transp. Co.

Alan S. Dale, Eastham, Watson, Dale & Forney, Houston, Tex., for Dixie Carriers, Inc.

William F. King, Major, Sage & King, Alexandria, Va., for Hennepin Towing Co.

Before WEIS, Circuit Judge, and DUMBAULD and SCALERA, District Judges.

## OPINION

SCALERA, District Judge.

This is an action to enjoin, set aside and annul the order of the Interstate Commerce Commission (I.C.C.)[1] granting a certificate of public convenience and necessity to Sioux City and New Orleans Barge Lines, Inc. (SCNO), intervening defendant herein, to operate as a common carrier by water generally throughout the Mississippi River System and the Gulf Intracoastal Waterway.[2]

## I

### HISTORY OF THE CASE

On August 11, 1970, SCNO filed an application with the I.C.C. for a certificate of public convenience and necessity under § 309(c) of the Interstate Commerce Act, 49 U.S.C. § 909(c), seeking

---

1. Entered in its Docket No. W–431 (Sub. No. 12), Sioux City and New Orleans Barge Lines, Inc., Extension—Mississippi River System, reported at 343 I.C.C. 412 (1973).

2. This court has jurisdiction under 28 U.S.C. §§ 1336, 2284, 2321–2325. Venue exists under 28 U.S.C. § 1398, since plaintiff Union Mechling Corporation maintains its principal office in Pittsburgh, Pennsylvania.

authority as a common carrier by water on ports and points throughout the entire Mississippi River System and Gulf Intracoastal Waterway.[3] SCNO was a certificated common carrier by water authorized to operate between points on the Missouri and Arkansas Rivers as well as between points on the above-named rivers, on the one hand, and, on the other hand, to or from points along the Illinois Waterway, the Ohio River, and a portion of the lower Mississippi River.[4]

Noted in evidence is that 96% of SCNO's traffic volume consisted of bulk, unregulated commodities (mostly grain).

Unregulated or bulk traffic are goods loaded or carried without wrappers or containers and received without transportation mark or count. Bulk commodities are usually fungible goods such as grains, coal, or ore. Any water carrier can engage in the transportation of bulk commodities throughout the entire inland waterways without requesting any grant of authority from the I.C.C. This type of bulk or unregulated traffic accounts for approximately 96% of the totality of tonnage shipped by water carrier on this nation's inland waterways.

Regulated traffic comprises 4% of the total inland waterway tonnage. In or-

3. A detailed description of the authority sought and granted SCNO appears at Appendix "A" of the I.C.C.'s decision, 343 I.C.C. at 421:

"Operation by applicant, in interstate or foreign commerce, as a common carrier by water by non-self-propelled vessels with the use of separate towing vessels in the transportation of commodities generally, and by towing vessels in the performance of general towage, (a) between ports and points along the Illinois Waterway below and including the Lake Michigan ports between and including Waukegan, Ill., and Michigan City, Ind., on the one hand, and, points and ports listed in (b), (c), (d), and (e) listed below on the other hand; (b) between ports and points along the Ohio River below Pittsburgh, Pa., the Allegheny River below Kittanning, Pa., the Monongahela River below and including Fairmont, W. Va., on the one hand, and ports and points listed in (a), (c), (d), and (e) on the other hand; (c) between ports and points along the Mississippi River below and including Minneapolis, Minn., and Port Sulphur, La., the St. Croix River below and including Stillwater, Minn.; and the Minnesota River below its headwaters on the one hand, and points and ports listed in (a), (b), (d), and (e) on the other hand; (d) between ports and points along the Tennessee River below and including Knoxville, Tenn., and its tributaries, the Cumberland River and its tributaries below and including Carthage, Tenn., the Green River and its tributaries below its headwaters on the one hand and ports and points listed in (a), (b), (c), and (e), on the other hand; and (e) between ports and points along the Gulf Intracoastal Waterway from St. Marks, Fla., to and including Brownsville, Tex., and all tributaries and connecting ship channels includ-

ing the Black Warrior River, The Apalachicola River, the Chattahoochee River, The Pearl and West Pearl Rivers, the Trinity River to the head of navigation, the Port Allen Route between Baton Rouge, La., and the Gulf Intracoastal Waterway on the one hand and points and ports listed in (a), (b), (c)."

4. SCNO's present authority to operate as a common carrier by water is precisely described in Appendix B of the Commission's decision:

"operation by non-self-propelled vessels with the use of separate towing vessels, in the transportation of commodities generally and by towing vessels in the performance of general towage (1) between ports and points along the Missouri River, on the one hand, and, on the other, ports and points along the Illinois Waterway, the Ohio River, the Allegheny River below Kittanning, Pa., the Monongahela River below Brownsville, Pa., the Mississippi River from Grafton, Ill., to Port Sulphur, La., including the ports named, and on the Mississippi River-Gulf Outlet Channel; (2) between ports and points along the Missouri River below and including Sioux City, Iowa; (3) between points along the Arkansas-Verdigris Waterway; and (4) between points along the Arkansas-Verdigris Waterway on the one hand, and, on the other, points along the Mississippi River from Grafton, Ill., to Port Sulphur, La., the Illinois Waterway, the Ohio River, the Monogahela River below Brownsville, Pa., the Allegheny River below Kittanning, Pa., the Missouri River, and the Mississippi River-Gulf Outlet Channel, including the points named, restricted in (3) and (4) to the transportation of traffic of which the water carrier portion originates at, or is destined to, points on the Arkansas-Verdigris Waterway."

der to carry a regulated commodity such as steel sheets over a particular navigable channel, it would be necessary for the carrier to receive from the I.C.C. a certificate of public convenience and necessity.

During the pendency of this proceeding before the I.C.C., there was in effect a law, commonly referred to as "the Three-Commodity Rule," § 303(b) of the Interstate Commerce Act (Act), 49 U.S.C. § 903(b), which essentially acted as an exception to the general rule that bulk commodities move in an unregulated status. The Three-Commodity Rule provided that when more than three distinct bulk commodities were carried in a single tow, the commodities traveled in a regulated status. Thus, if several barges filled with wheat were in a tow with barges containing iron ore, soybeans, and coal, the rule converted the entire tow from an unregulated status to a regulated one.

The Three-Commodity Rule was repealed on December 28, 1973 by P.L. 93–201, after the I.C.C. rendered its decision on SCNO's application. Under the present state of the law, therefore, more than three different bulk commodi-

ties can be carried in a single tow in an unregulated status.

The named plaintiffs and intervening plaintiffs[5] along with many western and midwestern railroads[6] protested SCNO's application for the extended authority. The protestants offer service on or near the waterways which SCNO's application sought to serve. (343 I.C.C. at 416.)

Public hearings on SCNO's application, which consumed over two weeks of testimony, were held in Washington, D. C., and St. Louis, Missouri, in March, April, and May of 1971. SCNO presented over twenty supporting witnesses. The supporting witnesses included shippers from points along waterways which SCNO already served as a regulated carrier as well as shippers of regulated commodities from the waterways which SCNO proposed to serve by the application. The supporting witnesses may be classified into three general groups: (1) shippers of unregulated, bulk commodities (principally grain); (2) shippers of regulated commodities; and (3) spokesmen for the various ports, port authorities, and the various civil organi-

5. The plaintiffs represent four of the largest barge companies with general operating authority as common carriers by water on the Mississippi River System and the Gulf Intracoastal Waterway. They are: Union Mechling Corporation (Union Mechling); Federal Barge Lines, Inc. (Federal) and its affiliate Gulf-Canal Lines, Inc. (Gulf-Canal); American Commercial Barge Lines Company (ACBL) and its affiliate Coyle Lines, Inc. (Coyle Lines); and The Valley Line Company (Valley).

The intervening plaintiffs, Igert, Inc. (Igert), Arrow Transportation Company (Arrow), and Dixie Carriers, Inc. (Dixie), may be described as feeder carriers. These carriers do not possess the broad operating authority which the plaintiffs have been granted by the I.C.C. Rather, the intervening plaintiffs have authority to carry regulated traffic only on smaller rivers which "feed" the main channels of the Mississippi River System and the Gulf Intracoastal Waterway. Igert and Arrow have operating authority on the Green, the Tennessee, and the Cumberland Rivers, and it is naturally SCNO's grant of authority as it applies to these wa-

terways that results in their protest. Dixie, with authority on the Gulf Intracoastal Waterway, takes issue with this part of SCNO's grant by the Commission.

Dixie, in its brief, states that it would have preferred to challenge the I.C.C.'s grant to SCNO in the separate proceeding it (Dixie) initially filed in the United States District Court for the Southern District of Texas. However, that court stayed decision of Dixie's complaint which protested SCNO's grant of general operating authority on the Gulf Intracoastal Waterway pending the decision in this matter. Thereafter, Dixie moved to intervene in this matter.

Igert and Arrow followed a similar procedure. They first protested collectively SCNO's new authority on those rivers on which they possess operating certificates (the Green, Cumberland, and Tennessee) by filing for an injunction in the United States District Court for the Western District of Kentucky at Paducah. After the injunctive relief was denied, both parties moved to intervene in this proceeding.

6. The railroads are not parties.

zations of the cities which SCNO served and sought to serve. (Id. at 415.)

On April 20, 1972, the I.C.C.'s hearing examiner (now an Administrative Law Judge) handed down his report which recommended the denial of SCNO's application because SCNO had not established that the present and future public convenience and necessity required the proposed grant of authority. The Administrative Law Judge based his ultimate conclusion on several subsidiary findings. At page 9 of his report he concluded:

". . . it is not possible to find any real need for the service proposed by the applicant for the shippers of bulk commodities. The . . . evidence presented . . . is clearly insufficient to demonstrate that any meaningful advantage would accrue to bulk shippers or the applicant on any type of consistent basis by enabling it to move exempt bulk commodities in a regulated status. In fact, it appears that this would be somewhat of a rarity with most bulk shippers.

\* \* \* \* \* \*

"The evidence presented by shippers of inherently regulated commodities fails to show any material inadequacy in the present service."

Thereafter, SCNO, together with several of the supporting witnesses, filed exceptions to the Administrative Law Judge's report and recommended order. The competing barge lines and railroads filed replies.

On September 22, 1972, Division One of the I.C.C. voted to entertain oral argument on the matter, which was held in Washington, D.C., on October 25, 1972.

The I.C.C. on April 20, 1973, concluded that contrary to the Administrative Law Judge's report and recommended order, SCNO's application should be granted. The Commission found that:

"The evidence demonstrates that applicant will be able to render a more prompt, efficient, and economical service to shippers on the Missouri River if it is permitted to handle regulated and exempt traffic moving to and from intermediate points on the Mississippi River System and the Gulf Intracoastal Waterway. It also appears that, contrary to the arguments of protestants, shippers of exempt bulk commodities would be willing to have their commodities move in a regulated status, . . . . The ability of communities situated on the Missouri River to develop and promote water borne commerce and to locate industry is closely related to the quality of water carrier service available. We believe that Missouri River shippers are entitled to the benefits and the improvements in water transportation service which would flow from a grant of this application." 343 I.C.C. at 419.

The I.C.C. also rejected the contention by protestants (plaintiffs herein) that the grant of authority to SCNO would have an "appreciable effect" on their existing operations. The I.C.C. noted the projected growth of regulated traffic on the Mississippi River System and Gulf Intracoastal Waterway and concluded that the protestants authorized to conduct operations on the Missouri River (Federal and Union Mechling)[7] had neglected their common carrier obligations to the general public. (Id. at 420.) The I.C.C. granted SCNO's application on the condition that SCNO maintain at least the level of service it presently provides shippers on the Missouri River. (343 I.C.C. at 420.) And, the I.C.C. found that the grant of SCNO's application was "not a major federal action significantly affecting the quality of the human environment" and therefore no environmental statement was required by § 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S. C. § 4332(2)(C). (Id. at 420.)

7. Union Mechling's authority as a common carrier on the Missouri River extends upstream only to the Kansas City, Missouri, area. Federal's operating authority is co-extensive with that of SCNO along the entire Missouri River.

In June, 1973, petitions for reconsideration of the I.C.C.'s decision were filed by each plaintiff and intervening plaintiff. SCNO and several supporting witnesses responded to the above petitions by replies filed in July, 1973. On September 13, 1973, Division One, acting as an appellate division of the I.C.C., entered an order denying plaintiffs' and intervening plaintiffs' petitions for reconsideration, stating that the decision was in accordance with the evidence presented and the applicable law. This order more fully discussed the reasons for the I.C.C.'s conclusion that no NEPA statement was necessitated by its grant of authority to SCNO.

Plaintiffs Union Mechling, Federal, and American Commercial filed petitions requesting a finding that the extension of authority to SCNO involved an issue of general transportation importance under Rule 101(a)(4) of the I.C.C.'s Rules of Practice and that the proceeding be set for oral argument before the entire I.C.C. Intervening plaintiffs Arrow, Igert, and Dixie filed petitions requesting a finding of general transportation importance insofar as the grant of authority concerns the inland waterways upon which they possess general authority. On October 19, 1973, the I.C.C., at its general session, denied the above petitions and concluded that the grant to SCNO did not involve a matter of general transportation importance.

The plaintiffs sought a temporary restraining order of the I.C.C.'s grant of authority to SCNO pending the hearing and determination of this action by the required three-judge court. After hearing, plaintiff's motion for a temporary restraining order was denied by this court because the plaintiffs failed to show that the granting of SCNO's certificate would irreparably injure them as 28 U.S.C. § 2284(3) requires. As a result of the denial of the temporary restraining order, the certificate issued to SCNO became effective.

A motion by the plaintiffs to consolidate this proceeding with Civil Action No. 73–1063 (Union Mechling, et al. v. United States of America and the Interstate Commerce Commission and Hennepin Towing Company) was denied by this court on February 14, 1974.

Briefs were filed and oral argument was held before the statutory court.

## II

### SCOPE OF REVIEW

■ In a suit of this nature to set aside an I.C.C. order, the scope of review of this three-judge court is governed by the Administrative Procedure Act, 5 U.S.C. § 706.[8] Minneapolis & St. Louis Railway v. United States, 361 U.S. 173, 192, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959). The exact scope of this judicial review has been expressed in various ways. Judge Aldisert in Leonard Express, Inc. v. United States, 298 F.Supp. 556, 559 (W.D.Pa.1969) stated:

"There have been various judicial expressions of the precise scope of this review. We are impressed by the standard set forth in Illinois Central R. Co. v. United States, 263 F.Supp. 421, 430 (D.C.Ill.1966), aff'd 385 U.S. 457, 87 S.Ct. 612, 17 L.Ed.2d 509:

'The function of this court in reviewing this determination of the

---

8. The relevant portions of § 706 are:
   "The reviewing courts shall—. . .
   (2) hold unlawful and set aside agency action, findings, and conclusions found to be
   —
   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
   (B) contrary to constitutional right, power, privilege, or immunity;
   (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to a trial de novo by the reviewing court."

Commission is sharply restricted. "It is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done." United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946); 5 U.S.C. § 1009(e). "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 694, 78 L.Ed. 1260 (1934). Once this court finds substantial evidence in support of the Commission's findings, it cannot go further and inquire into the soundness of the Commission's reasoning or the wisdom of the result. Virginian Ry. v. United States, 272 U.S. 658, 663, 47 S.Ct. 222, 71 L.Ed. 463 (1926); United States v. New River Co., 265 U.S. 533, 542, 44 S.Ct. 610, 68 L.Ed. 1165 (1924).' "

■ "Substantial evidence" in the sense it is used in the Administrative Procedure Act, 5 U.S.C. § 706(2)(E), has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126. "[I]t must be enough to justify, if the trial went to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660. This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. Consolo v. Federal Maritime Commission, 383 U.S. 607, 619–620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).

## III

### *Effect of Administrative Law Judge's Proposed Conclusions and Findings*

Division One of the I.C.C. in its decision reached ultimate conclusions and findings contrary to those proposed by the Administrative Law Judge. Yet, Division One essentially adopted the Administrative Law Judge's statement of the facts and summary of the evidence. The I.C.C. is not bound in any way by the "proposed" conclusions of the Administrative Law Judge. In the final analysis, it is the obligation of the Commission to make its own decisions and in so doing it is free to accept or reject the recommendations of the Administrative Law Judge. Administrative Procedure Act (APA), § 8(a), 5 U.S.C. § 557(b); Braswell Motor Freight Lines, Inc. v. United States, 275 F.Supp. 98 (W.D. Tex.1967) aff'd 389 U.S. 569, 88 S.Ct. 692, 19 L.Ed.2d 779, rehearing denied 390 U.S. 975, 88 S.Ct. 1025, 19 L.Ed.2d 1194 (1968).

■ To put it another way, the mere fact that the Commission adopts the Administrative Law Judge's findings of fact does not impose upon the Commission the added burden of explaining how it arrived at contrary conclusions because the APA does not relegate the Commission to the role of a reviewing court; rather, the APA confers on the Commission the right to make its own conclusions from the evidence. Morgan Drive-Away, Inc. v. United States, 268 F.Supp. 886 (N.D.Ind.1967).

■ There is no requirement that the Commission furnish an analysis of each and every item of evidence brought before the Administrative Law Judge, nor is the Division (Commission) required to disclose the mental process through which its ultimate conclusion was reached. As long as the Commission's findings are expressed with sufficient particularity to inform the court and the parties of the basis of its decision, the I.C.C. has fulfilled its statu-

tory purpose. Caravelle Express, Inc. v. United States, 287 F.Supp. 585, 588 (D. Neb.1968).

### IV

*Need for Improvement of Water Carrier Service on the Missouri River*

The decision of the I.C.C. is bottomed on the objective of providing improved service to Missouri River shippers and receivers. In reaching its ultimate decision that the requested authority should be granted, the Commission concluded that:

   (a) ". . . the desirability of a more efficient and economical service to shippers and receivers on the Missouri justifies a grant of the proposed authority." 343 I.C.C. at 418.

   (b) "The ability of communities situated on the Missouri River to develop and promote waterborne commerce and to locate industry is closely related to the quality of water carrier service available. We believe that Missouri River shippers are entitled to the benefits and the improvements in water transportation service which would flow from a grant of this application." Id. at 419.

The need for improvement of service on the Missouri River is in part due to the River's physical and geographic characteristics. The Missouri is navigable from its mouth (on the Mississippi River north of St. Louis, Missouri) to Sioux City, Iowa, only because of the extensive and costly work of the United States Corps of Engineers. By the utilization of locks, dikes, and dredging, the Missouri, inherently non-navigable, has become a useful inland waterway. However, the Missouri River has a swift current; it is narrow and shallow. Apparently only a maximum of six to eight barges may be carried in a single tow on the Missouri from its mouth to the Kansas City area. On the Mississippi River, twenty to forty barges may be placed in a single tow.

At least three companies on the Missouri testified that time in transit for their products shipped by SCNO has been excessive. Stormor, Inc., Behlen Manufacturing Company, and Valmont Industries, steel fabricators and processors, have been put to a competitive and economic disadvantage by delays in SCNO's barge service.[9] For example, Stormer, Inc., a steel fabricator, receives galvanized steel. As time in transit increases, the steel becomes subject to a white rust, making the steel unsuitable for the uses to which it might otherwise be put and accordingly increases inventory and other costs connected with handling.

Behlen Manufacturing Company, which depends on SCNO for the transportation of its raw steel from Chicago and New Orleans to its Nebraska plant, also testified to delays. These delays disrupt its production schedule, sometimes putting this steel processor to the added expense of substituting higher grade steel for the delayed steel. SCNO has informed Behlen that the delays have been the result of holding barges at New Orleans until sufficiently large and economic tows can be assembled for the northbound journey.

Valmont Industries, operator of a steel processing plant in Nebraska, relies on SCNO for the transportation of steel from New Orleans to Omaha. This company, which schedules its production according to expected arrival time of its import steel via SCNO, has experienced added costs and customer dissatisfaction from the delayed arrival of SCNO's inbound shipments. Again, SCNO has attributed the delay to the necessity of holding barges at New Orleans for inclusion in a tow.

The testimony of the three steel processors, who generally have been satisfied with SCNO's past service, sup-

---

9. Appendix C of the report and recommendation of the Administrative Law Judge, pp. 4–6.

ports the Commission's conclusion that a need exists for improved service on the Missouri.

## V

*Neglect by Plaintiffs of Their Common Carrier Obligations on the Missouri*

Plaintiffs Federal and Union Mechling are the only two carriers in addition to SCNO authorized to conduct operations on the Missouri. Federal's authority is co-extensive with that of SCNO (running the entire length of the navigable portion of the River). Union Mechling has authority upstream as far as the Kansas City area. One of the subsidiary findings which the Division made in reaching its conclusion granting SCNO the requested authority was:

"... those protestants who are authorized to conduct operations on the Missouri have neglected their common carrier obligations to the general public by closing their offices at points on the Missouri River and withdrawing their equipment from service on that river, and thus do not appear to have a sincere interest in the transportation of traffic on the Missouri." 343 I.C.C. at 419.

Plaintiffs contend that the finding is not based on substantial evidence. Plaintiffs argue that neither Federal nor Union Mechling ever had an office on the Missouri; therefore these two plaintiffs could have never closed any such offices and that not even SCNO has an office on the Missouri River. Furthermore, plaintiffs contend that the existence of an office on that River does not indicate a lack of interest in serving the Missouri, since telephone and telex service between shipper/receiver and the carrier provide an adequate communication.

The existence of offices on the Missouri appears to be inconclusive on the issue of neglect of service or lack of interest by Union Mechling and Federal in serving the Missouri. The real thrust of the Division's finding of neglect relates to the number of empty barges and power equipment placed on the Missouri by these two plaintiffs. Plaintiff Union Mechling concedes that it has never placed any power equipment on the Missouri, and Federal, which once put its own power equipment onto the Missouri, has also "turned to the use of outside power" on the Missouri. (Br. at p. 33.) (At oral argument, counsel for plaintiffs declared that none of the plaintiffs placed self-owned, empty barges on the Missouri.) Federal and Union Mechling use the barges of local carriers and contract to pick up these when they come off the Missouri and onto the Mississippi River. (Tr. at p. 28.)

There seems to be little dispute that these plaintiffs (Union Mechling and Federal) have refused to use their own barges and power equipment on the Missouri. SCNO argues that the Division's conclusion that these two plaintiffs neglected the Missouri was not raised by Federal in its petition for reconsideration of the decision and therefore this issue cannot be raised by Federal before this court. Slay Transportation Co., Inc. v. United States, 353 F.Supp. 555, 558 (E.D.Mo.1973); United States v. L. A. Tucker Truck Lines, 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952).

Union Mechling contends that it is unfair for the Commission to expect it to use its own equipment to serve the Missouri because, as plaintiffs' counsel put it at oral argument (Tr. p. 28), it would be "economic suicide" for Union Mechling or Federal (or for any other of the plaintiffs assuming they were authorized) to operate expensive, very high-powered boats on the Missouri at a mere fraction of the boat's towing capacity. The maximum number of barges which can be pulled in a tow on the Missouri is six to eight. This limitation makes the Missouri economically unattractive, especially for a carrier that possesses operating authority on the Mississippi where the profit margin is much greater because twenty to forty barges may be placed in a single tow. Union Mechling argues that for the I.C.C. to expect frequent operation of its equipment on

the Missouri is unreasonable in light of the marginal profit that could be derived from exclusive Missouri River service.

█ The conclusion that Union Mechling and Federal failed to serve the Missouri has been amply supported by the evidence in the record.

## VI

### *Will the Grant of Authority to SCNO Result in Better Service on the Missouri?*

The Commission found that its action would enable SCNO to better service the Missouri: ". . . the desirability of a more efficient and economical service to shippers and receivers on the Missouri justifies a grant of the proposed authority." 343 I.C.C. at 418. As the Commission concluded:

"In this proceeding, the evidence demonstrates that applicant will be able to render a more prompt, efficient, and economical service to shippers on the Missouri River if it is permitted to handle regulated and exempt traffic moving to and from intermediate points on the Mississippi River system and the Gulf Intracoastal Waterway. . . . The ability of communities situated on the Missouri River to develop and promote waterborne commerce and to locate industry is closely related to the quality of water carrier service available. We believe that Missouri River shippers are entitled to the benefits and the improvements in water transportation service which would flow from a grant of this application." 343 I. C. C. at 419.

The plaintiffs, representing the larger barge lines which possess operating authority on the entire Mississippi River System and the Gulf Intracoastal Waterway, and the intervening plaintiffs, with authority on rivers which are tributaries on the Mississippi River System (Green, Cumberland, and Tennessee Rivers) and on the Gulf Intracoastal Waterway, argue that there is no basis to support

this broad grant of authority to SCNO and that the conclusion of the Commission is arbitrary, capricious, and not based on substantial evidence. Because plaintiffs and intervening plaintiffs dispute the Division's finding only to the extent of their appropriate interest, their positions are considered separately.

### A. Plaintiffs' Contentions

Plaintiffs contend that there is no basis for the finding that SCNO could provide an improved service on the Missouri if it were granted the requested authority.

Plaintiffs note that the vast majority of tonnage carried by SCNO is bulk exempt or non-regulated. Secondly, plaintiffs doubt that the proposed authority on the Mississippi could really improve SCNO's service on the Missouri because SCNO already possesses restricted, overhead rights to ship regulated traffic to or from places and points on the Missouri, on one hand, and the Mississippi, south of the mouth of the Missouri River to New Orleans, the Illinois River, and the Ohio River, on the other hand.

We cannot agree that this grant of authority to SCNO was not based on substantial evidence. Whether SCNO carries 96% or 99% of its total tonnage bulk exempt (unregulated) is not the significant factor in determining whether this grant to SCNO will enable it to better serve the Missouri. It is an undisputed fact that, considering domestic water carriers as a whole, 90% or more of the totality of tonnage carried by them is bulk exempt (unregulated). It is equally unquestioned that the I.C.C. has exclusive jurisdiction to issue certificates of public convenience and necessity for the transportation of any regulated, non-exempt commodity notwithstanding the smallness or insignificance of the particular item. That regulated traffic is a very small percentage of the totality of tonnage shipped on the Mississippi River System is not determinative of the issue of whether this proposed grant will improve SCNO's service to the Missouri River.

The grant to SCNO appears to be grounded upon substantial evidence. First, the plaintiffs who possess operating rights on the Missouri do not operate their self-owned barges or power equipment on that River because of the Missouri's low profit margin. Because SCNO is the principal operator on the Missouri, it, under the evidence, receives a lower return on the barges it puts on the Missouri. However, SCNO, unlike the plaintiffs, does not possess regulated authority on the Mississippi to compensate for the effect of the Missouri's negative profit margin.

SCNO explained in evidence before the I.C.C. how it has been inefficiently operating under its limited authority. Typically, SCNO would travel down the Missouri onto the Mississippi with six to eight barges loaded for southbound movement to New Orleans. Because of the inefficiency of hauling only eight barges on a river that has a capacity to handle twenty to forty barges in a tow, SCNO would tie off the loaded barges and wait until enough barges were accumulated to make the southbound trip on the Mississippi profitable.

It is true that this delay lengthens in-transit time. SCNO, prior to the grant, possessed the authority to take regulated traffic from the Missouri to a point along the Mississippi (south of the mouth of the Missouri).[10] However, SCNO was prohibited, for example, from picking up barges loaded with regulated commodities in St. Louis and transporting them to Memphis, Tennessee, or to New Orleans. The inability of SCNO to pick up regulated traffic at intermediate points on the Mississippi results in longer waits to accumulate enough barges to make the more profitable longer tow.

Apparently under the grant permitting SCNO to operate as a general carrier on the Mississippi, SCNO could pick up more barges more quickly to make up the longer tow. And correspondingly, there would be improvement in the transit time for Missouri shippers.

In upstream travel from New Orleans, transit time could also become more efficient. As the testimony indicates, Instel Corporation, a large steel importer, has been dissatisfied with its present barge service (provided by a non-party carrier) because of delayed arrivals of its steel, which results in its inability to meet customer demands. Instel is of the general opinion that barge service on the Mississippi is generally inadequate. (Appendix C to the Administrative Law Judge's report, p. 3.) As a general carrier on the Mississippi, SCNO could more promptly fill out its barges at New Orleans by serving Instel and also more promptly serve a present customer like Valmont Industries, of Nebraska. As a Missouri River company using SCNO barge service from New Orleans, Valmont has been generally satisfied with the applicant's service. However, Valmont, which gears its production schedule to the expected arrival of the import steel which SCNO carries, has experienced delays in arrival time of its steel because of SCNO's practice of holding barges at New Orleans until it can make up a longer tow. Such delays have caused customer dissatisfaction. (Appendix C to the Administrative Law Judge's report, p. 5.) The testimony of Behlen Manufacturing Company, a steel fabricator of agricultural products which has used SCNO's service for the transportation of raw steel from New Orleans to its Nebraska (Missouri River Area) plant, also supports the Division's finding. Behlen, like Valmont, has been generally satisfied with SCNO's present service although it has been experiencing delayed arrivals because of SCNO's practice of holding barges for inclusion in a more profitable tow.

---

10. SCNO has general operating authority on the Missouri and Arkansas-Verdigris Waterway. It also possesses restricted, overhead authority, that is, authorization to carry regulated commodities to or from the Missouri and Arkansas Rivers, on the one hand, and the Illinois Waterway, the Ohio River, including its sources, the Allegheny and the Monongahela Rivers, and the Mississippi River south of the mouth of the Missouri, on the other hand.

424

The existence of a barge shortage during the harvest season in October and November and, to a lesser extent, during January through April of each year causes many bulk shippers to pay premium, regulated-rate type tariffs in order to secure barges to ship their bulk commodities. (343 I.C.C. at 415.) Pillsbury Company, one of the largest shippers of bulk-exempt grain, testified about its difficulties in obtaining barges during the harvest season and its payment of premium or near-tariff rates in order to secure barges for the transportation of its otherwise exempt grain. (Appendix C, p. 10.) Tabor & Co., another large shipper of grain, testified that it has experienced similar difficulties in obtaining barges during the shortage period, and, that when it did in fact secure barges, it was required to pay a premium rate to its carriers, including many of plaintiffs' subsidiaries. (Appendix C, p. 10.)

The record contains the substantial evidence required in our review to support the I.C.C.'s conclusion that the proposed grant to SCNO on the entire Mississippi River System and Gulf Intracoastal Waterway would promote more efficient and more prompt barge service on the Missouri.

### B. The Contentions of the Intervening Plaintiffs

Igert and Arrow contend that while there may be some "evidentiary support" for the grant of authority to SCNO on the Illinois, the Mississippi, and the Ohio Rivers, no rational relationship exists between the ability of SCNO to serve the Missouri and the grant of authority to SCNO on the Cumberland, Tennessee, and Green Rivers.

SCNO in rebuttal refers to the testimony of several of its Missouri River customers which require barge service either to or from the Tennessee River. World Publishing Company (publisher of the *Omaha World Herald*) uses joint barge service, a collaborative effort of SCNO and another barge company, to carry newsprint (a regulated commodity) from a tributary of the Tennessee up the Missouri River to Omaha, Nebraska. The company is dissatisfied with the delays it has experienced from the joint barge service and believes it could be more promptly served if single line service were available from SCNO. (Appendix C to the Administrative Law Judge's report and recommendation, pp. 3–4.)

Consolidated Blenders, Inc., of Fremont, Nebraska, has used SCNO's service to ship its dehydrated alfalfa pellets (apparently a regulated commodity) from Missouri River points to the Tennessee. The alfalfa pellets must contain a specified amount of carotene to be marketable. Carotene content declines with the passage of time. Transit time is extended while SCNO waits to assemble a sufficient number of barges to include in a tow. Consolidated Blenders supports the grant to SCNO because its barge service will improve because SCNO will be enabled to more quickly fill out its tows. (Appendix C, p. 6.) This evidence provides support for the Commission's conclusion about the Tennessee River.

SCNO contends because there is a need for "area-wide" transportation improvement, there is no requirement that SCNO show a need for service on every point of every river upon which authority is sought. SCNO contends that testimony as to need for improvement of service at a representative number of points between the Missouri and the Tennessee Rivers raises the rebuttable inference of a need for similar improvement at other points within the same area but along different rivers (the Cumberland and the Green) as to which no specific testimony was offered. Atlanta-New Orleans Motor Freight Co. v. United States, 197 F.Supp. 364, 369 (N. D.Ga.1961); Hudson Transit Lines, Inc. v. United States, 314 F.Supp. 197, 202 (D.N.J.1970); American Trucking Associations, Inc. v. United States, 373 F. Supp. 252 (W.D.Tex., Austin Division, 1973).

Because SCNO has introduced evidence demonstrating the desirability of improved service between the Missouri and the Tennessee, this court cannot say that the Commission acted arbitrarily or unreasonably in concluding that an improved service was desirable for those shippers on the Green and Cumberland Rivers. The fact that there was no direct testimony with respect to the need and/or desirability of SCNO's service to the above Rivers does not require the deletion of these Rivers from the grant under review. The applicant sought authority over rivers in general areas—the Mississippi, the Ohio, the Illinois—in order to improve its service to another area (the Missouri). Mindful that this court is not empowered to substitute its judgment as to the correctness of the inference drawn by the Commission about the Cumberland and Green Rivers, the court concludes that the grant to serve these Rivers is not unreasonable.

Dixie protests SCNO's new authority as a common carrier on the Gulf Intracoastal Waterway. World Publishing Company of Omaha, Nebraska, in addition to receiving newsprint from the Tennessee, uses SCNO's barge service to carry newsprint from Texas via the Intracoastal Waterway. World has relied on joint service from SCNO and other carriers to carry the Texas newsprint. The publishing company would prefer that SCNO have the ability to render it single-line service from this Texas source of newsprint in order to improve the often-delayed transit time. (Appendix C, pp. 3–4.) National Steel also supports SCNO's authority on this waterway because this steel fabricator, which ships bulk-exempt commodities as well as regulated steel, through and from Gulf points, has been dissatisfied with the delays in its service. National also indicated that it is planning a new steel processing facility in Texas and therefore will need adequate and prompt regulated and non-regulated service at this future plant via the Intracoastal

Waterway to remain competitive. (Appendix C, p. 1.)

## VII

### Will the Grant of Authority Have a Harmful Impact on the Protesting Carriers?

Plaintiffs and intervening plaintiffs contend that the Commission erred in concluding:

"In view of the projected growth of regulated traffic on the Mississippi and Gulf Intracoastal Waterway, it does not appear that applicant's participation in the transportation of such traffic would have an appreciable effect on the operations of existing carriers. . . . With regard to those protestants whose operations are confined to 'feeder' services, it does not appear that a grant of authority to applicant would have a material adverse effect on their operations as they appear likely to retain the traffic they now handled [sic]." 343 I.C.C. at 419.

The discussion here will not consider whether the Commission has failed to consider the possible harmful impact to the protestants from the cumulative effect of three other grants of authority in other cases on substantial portions of the Mississippi River System. Whether the Commission failed "to consider" the cumulative impact of the three other certificates issued in other cases shall be deferred to a subsequent section. The issue here is whether the grant of authority to SCNO alone will have a harmful impact to the plaintiffs.

### A. Harmful Impact to the Plaintiffs?

The testimony before the Hearing Examiner by the various spokesmen for these large barge companies, however, generally asserts that the certification of SCNO will automatically divert some of the plaintiffs' regulated tonnage. Mr. Mechling (for Union Mechling), Mr. Kimutis (for Valley), Mr. Kernan (for American Commercial), and Mr. Muellar (for Federal) testified that some per-

centage of the regulated tonnage their respective companies now service will be diverted to SCNO. (Tr. 1464–1465, 1625–1628, 1776–1778, 1905.) Counsel for SCNO noted that these opinions were based on the spokesmen's personal experiences in the barge business and not upon any factual or objective study of the regulated traffic which would be lost. The bases of these opinions as to the automatic harmful effect of SCNO's certification seems to be rooted in the generally followed practice by shippers of inherently regulated commodities (especially the larger steel companies) of giving all the certificated carriers in a particular geographic area a portion of their regulated commodities. None of the plaintiffs' spokesmen could really specify how the shippers decided which carrier received how much of a percentage of the regulated traffic, nor how many shippers practice such a policy. While the potential growth of regulated traffic was disputed by Mechling (Tr. 1465), Kimutis believed that an overall growth was occurring in both regulated and bulk barge traffic. (Tr. 1627.) And Mueller, on behalf of Federal, testified that bulk traffic is not any more profitable than regulated traffic. (Ex. 62, p. 5.)

While it could reasonably be concluded that this testimony proves that perhaps some of the plaintiffs' regulated traffic will be diverted to SCNO, this is insufficient to conclude that the Division's decision on lack of impact lacks the support of substantial evidence. Though it can be argued that a small portion of plaintiffs' regulated traffic may decline, not one witness had the objective evidence of a traffic study to support this contention. Nor was it denied that growth, at least insofar as bulk traffic is concerned, will occur to enable plaintiffs to offset any possible loss from their regulated revenues. And, in this regard, we repeat that one of plaintiffs' spokesmen (Mueller from Federal) opined that regulated traffic is not more profitable than bulk traffic. (Ex. 62, p.

5.) On the issue of harmful impact, as on other issues, this court cannot substitute its judgment for that of the Commission.

■ If the argument of the plaintiffs may be understood to dispute the Commission's decision on prejudicial impact on the basis that increased competition would result, it is fundamental that the Commission, not the courts, determine how much competition may be desirable in the public interest. It was long ago held in Chesapeake & O. Ry. Co. v. United States, 283 U.S. 35, 41–42, 51 S.Ct. 337, 75 L.Ed. 824 (1937) that the Commission may even authorize new service for the very purpose of promoting competition if it believes that the new service will be convenient or necessary to the public interest. The words of Justice Douglas in a decision often relied on today illuminate the amount of discretion and expert judgment with which the Commission is entrusted:

> "Its function is not only to appraise the facts and to draw inferences from them but also to bring to bear upon the problem an expert judgment and to determine from its analysis of the total situation on which side of the controversy the public interest lies. . . . Forecasts as to the future are necessary to the decision." United States v. Detroit & Cleveland Nav. Co., 326 U.S. 236, 66 S.Ct. 75, 90 L. Ed. 38 (1945).

■ The conclusion by the Commission that no appreciable prejudice would result to the existing Mississippi River carriers (Union Mechling, Federal, American Commercial, and Valley) is warranted by substantial fact and such conclusion was reached within the authority of the Commission.

### B. Prejudicial Impact on the Intervening Plaintiffs?

■ The contentions raised by the intervening plaintiffs (Igert, Arrow, and Dixie) parallel those raised by the

plaintiffs and, for similar reasons they must be rejected.

Although the Commission found that the grant of authority to SCNO on the Tennessee, the Green, and the Cumberland Rivers would not adversely affect the operations of Igert and Arrow, these feeder lines disagree. Arrow and Igert both compete with American Commercial and Valley on these feeder rivers. Neither of these carriers appears to interline any substantial regulated traffic with SCNO. In fact, Igert admitted that the only regulated tonnage it would lose as a result of SCNO's certification would be the interline handling (for $1,733) of Consolidated Blenders' alfalfa pellets. (Tr. 1718.) As a certificated carrier on the Tennessee, SCNO could provide single line service for the shipper, while depriving Igert only of a very insignificant amount of revenue. As to Arrow, there is no objective traffic study submitted by this protestant to show in what manner SCNO's certification would substantially impair its regulated traffic on these rivers. To the contrary, Arrow appears to be able to keep its high percentage of Tennessee River regulated traffic. (Tr. 1679.)

Turning to the contention of Dixie on the Gulf Intracoastal Waterway, again we cannot say that this carrier has supported its assertion of harmful impact by objective evidence in the record. Dixie competes successfully with American Commercial and Federal (or their affiliates) on this waterway. There is evidence that anticipated growth of regulated traffic west of New Orleans on this waterway will increase the demand for regulated carriers. This court cannot say that Dixie will be substantially prejudiced by the certification.

## VIII

*Has the Division Failed to "Consider" the Cumulative Impact of the 3 Other Certificates Granted Over Substantial Portions of the Mississippi River System in Other Cases?*

Plaintiffs' brief contends that the Division's finding that no harmful impact would occur as a result of the grant to SCNO is erroneous because the Commission failed to consider the cumulative impact caused by the three other grants of authority over substantial portions of the Mississippi River System.[11] Plaintiffs note that the number of regulated carriers on the main branch of the Mississippi River will be doubled by these grants. Yet it is contended the Division has given no consideration in its opinion on SCNO's application to these three other, nearly contemporaneous grants of authority. Plaintiffs argue that the Division's failure to consider the cumulative impact of the three other certificates is a violation of the Commission's statutory obligation to give proper consideration to the public interest in its broad sense under § 309(c) of the Act, and that this failure necessitates remanding the decision to the I.C.C.

Plaintiffs do not seek any "procedural or physical consolidation" of these different cases; rather, plaintiffs contend that the Commission has not given "consideration to the cumulative effect of the substantially simultaneous issuances of authorities which superimpose four new system operations on the four that now exist." (Br. at p. 22.) SCNO points out why plaintiffs do not contend that consolidation of the four cases should have occurred: plaintiffs are in effect estopped from raising such an argument[12] since plaintiff Federal op-

11. The three other grants of authority: Hennepin Towing Company Extension—Upper Mississippi River, Docket No. W-536 (Sub—No. 12) decided a week after SCNO on April 27, 1973; the Ohio River Company Extension—Lower Mississippi River, Docket No. W-414 (Sub—No. 8) decided July 20, 1973; and Security Barge Lines, Inc. Extension—Removal of Restriction, Docket No.

W-1235 (Sub—No. 1) decided August 29, 1973. The map which counsel for Union Mechling submitted illustrates the authority of the existing carriers, the authority of the applicants prior to these grants, and the extent of increase in the carriers' authority.

12. The motion to consolidate SCNO with Hennepin had been denied by the court.

posed Security Barge's motion for consolidation (of the four cases) on the basis that the cases involve different parties, different issues, different existing water carrier rights, and different potential geographic extensions. (Reply of Federal to Security Barge's motion to consolidate and reply of Federal to Security's petition for reconsideration of order denying consolidation, dated November 2, 1972 and December 8, 1972.) SCNO, in its brief, contends that the plaintiffs are not entitled to raise this issue of cumulative impact before this court on review since it was not properly raised (and therefore preserved for review) before the Division in the plaintiffs' petitions for reconsideration of the SCNO's decision filed June 15 and 18, 1973. Slay Transportation Co. v. United States, supra, and United States v. L. A. Tucker Truck Lines, supra, 344 U.S. at 36–37, 73 S.Ct. 67.

While it may be true that plaintiffs' petitions for reconsideration of the SCNO grant are not precise on the cumulative effect of the three subsequent cases, the petitions do note that the Hennepin case—decided April 27, 1973 —would cause more prejudicial impact on their proportionate share of regulated tonnage. The obvious reason why the plaintiffs did not mention either the Ohio River Company application or Security Barge's application is that they were not decided until July and August of 1973. Plaintiffs, however, did contend that the Division's decision in SCNO had failed to give proper consideration to the other three grants when they petitioned the I.C.C. for a finding that the SCNO application involved a matter of general transportation importance which necessitates convening the entire Commission pursuant to I.C.C. Rule 101(4) on October 4, 1973.

Plaintiffs compare what they term the Division's "blinding failure to consider cumulative impact" herein to the error committed by the Commission in failing to consider the additional authority granted to competing carriers in Arkansas-Best Freight System v. United States, 364 F.Supp. 1239 (W.D.Ark. 1973). Plaintiffs also refer to language in United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 529, 66 S.Ct. 687, 90 L.Ed. 821 (1946), to support their proposition. These cases do not support plaintiffs' contention.

Turning first to the *Arkansas-Best Freight* case, it should be noted that there a division of the I.C.C. had reversed the Examiners and found that three of the ten motor carrier applications (for the same route) should be granted because there was a paucity of single service on the route. 364 F.Supp. at 1261. Because of many deficiencies, the division's decision was suspended by the District Court (the court found that the division had arbitrarily given more weight to the exhibits favorable to the applicants while it disregarded exhibits unfavorable to the applicants, and findings of the division in its report were clearly contradicted by the factual data contained in an appendix to that report.) Pertinent to our discussion, the court noted that the division relied on the quality of motor service available in 1966 for its 1971 report. In 1966 there was but one carrier on the route in question. At the time of the division's decision, there were seven carriers on the particular route. Although the division in *Arkansas-Best* acknowledged its duty to consider the recent grants of authority (the six additional certificates), it did not consider what action it had recently taken with respect to the application of one of the plaintiffs (West) for authority on the same route. The division, on one hand, was willing to grant authority to three more applicants in *Arkansas-Best* (making a total of ten certified), yet, on the other hand, while the division's decision in *Best* was pending on exceptions, it, in another proceeding, had denied the application of West (a plaintiff in *Best*) for authority on essentially the same points involved in *Best* on the sole ground that Mercury (another plaintiff in the *Best* case) had been already granted authority on the same route. It was this type of arbi-

trariness and capriciousness that caused the court in *Best* to suspend the Division's report.

There are many distinguishing factors which cause the *Best* case to be of little support for the plaintiffs' contention: (1) in *Best*, the grant of authority which the division failed to consider involved parties to the *Best* litigation (the other three applicants are not parties to this litigation); (2) in *Best*, the division refused to grant the authority to plaintiff West while it employed the same reason to grant the three other applications (the improvement of service on the Missouri is the object of SCNO's grant, while the other grants have a different rationale for their bases); and (3) most importantly, in *Best*, the division arbitrarily sifted the evidence in the record to favor the three applicants while it refused to consider unfavorable evidence.

As to United States v. Pierce Auto Freight Lines, Inc., supra, the plaintiffs' brief refers us to the following passage:

"The contention [that the Commission may not consider other pending cases] in its farthest reach amounts to a legal version of the scriptural injunction against letting one's right hand know what one's left may be doing. "Obviously it would be consistent neither with good sense nor, we think, with the type of hearing assured by the statute to force the Commission to put on such complete blinders." 327 U.S. at 529, 66 S.Ct. at 695.

The context in which the court makes the above statement must be analyzed. In *Pierce Auto*, two motor carriers applied for certification to independently and as competitors carry goods between San Francisco and Portland, Oregon. The applicants assumed, as did the District Court, that only one of their applications would be granted, so initially each opposed the other's certification. The appellees' (competing carriers), who of course also opposed the certifications, principal cause of complaint before the Supreme Court was that the Commission

did not consider each case exclusively on its own record but instead looked to the evidence in both proceedings in forming its judgment. The court noted that if in fact the Commission were shown to have prejudicially considered evidence bearing on one case which did not affect it and was presented in the other, then the orders, or one of them, would be set aside. Finding that the appellees had not shown prejudice, and noting that much of the evidence was identical and was introduced by the parties' stipulations, it concluded that "the mere fact that the determining body has looked beyond the record proper does not invalidate its action unless substantial prejudice is shown to result." Id. 327 U.S. at 530, 66 S.Ct. at 695.

Plaintiffs seem to cite this case for the proposition that the Division must look beyond the record (the SCNO record) to other pending cases in deciding matters of "public convenience and necessity" or else substantial prejudice will be done. This, of course, is not the holding or the reasoning of *Pierce*. *Pierce* simply holds (in a case where all parties to two separate applications were present, involving the same desired authority, for essentially the same reasons) that the Commission could look beyond the technical four corners of the one case to the other in deciding on the applications, as long as no prejudice resulted.

*Pierce* does not mandate that the Division look beyond the record before it to other cases which involve different parties seeking different grants of authority for entirely distinct reasons.

## IX

*Was There Substantial Evidence to Support the Division's Application of the Nashua Case?*

Plaintiffs argue that the case of Nashua Motor Express, Inc. v. United States, 230 F.Supp. 646 (D.N.H.1964) is inapplicable to the application. They contend that the *Nashua* case stands for

the proposition that "in certain unusual cases" the absence of inadequacy of existing service will not be sufficient basis to deny the application. Specifically, protestants assert that because there is no evidence to indicate that the proposed service by SCNO will in any way be better than the service presently provided by the existing carriers, the rationale of the *Nashua* case is misplaced herein.

## A.

The reliance on the *Nashua* case by the I.C.C. was significant. While recognizing the opposing carriers' ability to adequately serve the Mississippi System and the Gulf Intracoastal Waterway, the Division concluded that improved service to shippers and receivers on the Missouri justified the grant of the proposed authority. The Division's report relied on *Nashua* for the proposition that inadequacy of existing service is but one factor of many which must be examined in deciding whether the public convenience and necessity justifies the grant of proposed authority:

" * * * inadequacy of present service is not a term which is convertible with that of public convenience and necessity, but is, rather, only one element to be considered in arriving at the broader determination of public convenience and necessity * * *. Other elements of importance appear to be * * * the desirability of different kinds of service, and the desirability of improved service * * *. [In] issuing a certificate of public convenience and necessity, the [Commission] need not make a specific finding that present service is inadequate * * *. The converse of this proposition is that the absence of a finding of inadequacy is not alone sufficient to bar the issuance of a certificate when other factors justify a finding of public convenience and necessity. The element of inadequacy is thus not a controlling one, but is to be considered along with the other factors mentioned above * * *.

[T]he narrower conceptual element of inadequacy of present service was not intended to be imposed as a strait jacket upon the process of determining the broader interests of public convenience and necessity in the effectuation of the National Transportation Policy." *Nashua*, supra, at 652–653 (343 I.C.C. 418.)

Plaintiffs seem to argue that the authority of the Commission when making a determination of public convenience and necessity must give one factor—the inadequacy of existing service—more weight than any of the other relevant factors (such as desirability of improved service, different kinds of service, or future necessity). This theory is directly refuted by *Nashua*, supra, and the uniform holding of other cases. Lang Transportation Corp. v. United States, 75 F.Supp. 915, 930–931 (S.D.Cal.1948); Norfolk Southern Bus Corp. v. United States, 96 F.Supp. 756, 760–761 (E.D. Va.1950) aff'd. 340 U.S. 802, 71 S.Ct. 68, 95 L.Ed. 590 (1950); Hudson Transit Lines, Inc. v. United States, supra, 314 F.Supp. at 202; Younger Brothers, Inc. v. United States, 289 F.Supp. 545, 548 (S.D.Tex.1966). These cases support the proposition that a certificate of public convenience and necessity may be issued without a specific showing that the existing service is inadequate.

██ That inadequacy of service is but one of many factors which the Commission weighs in granting certificates of public convenience and necessity under § 309(c) of the Act (49 U.S.C. § 909(c)) is completely consistent with a broad interpretation of the Commission's power to issue or deny certificates of public convenience and necessity based not on a simple finding of adequate or inadequate service, but rather on an analysis of the "total situation" presented in the record. The United States Supreme Court noted:

"For the performance of that function [the issuance of certificates of public convenience and necessity] the Commission has been entrusted with a

wide range of discretionary authority. Interstate Commerce Commission v. Parker, 326 U.S. 60 [65 S.Ct. 1490, 89 L.Ed. 2051]. Its function is not only to appraise the facts and to draw inferences from them but also to bring to bear upon the problem an expert judgment and to determine from its analysis of the total situation on which side of the controversy the public interest lies." United States v. Detroit & Cleveland Nav. Co., supra, 326 U.S. 236, at 241, 66 S.Ct. 75, at 77. *Nashua* represents a more specific pronouncement of the factors to be weighed in determining the public interest.

■■■■ Apparently recognizing the basic thrust of *Nashua*, plaintiffs contend that *Nashua* has no application where the applicant will become "a brand new entrant in the field." This theory is apparently based on the fact that in the *Nashua* factual complex the protesting carriers were not seeking to bar new entrants, but really to prevent continued service by a carrier with which they had actively competed. This position is untenable because in Younger Brothers, Inc. v. United States, supra, 289 F.Supp. at 548, the court relied on *Nashua* (for the proposition that inadequate service is only one element to consider in determining public convenience and necessity) where protesting existing carriers were attempting to prevent new entrants in the field.

### B.

■■■■ Plaintiffs state that the *Nashua* case should not apply to this case for the reason that *Nashua* is applicable only if the proposed service will provide service better than that provided by the existing carriers. This contention is without merit. First of all, when protestants deny that the grant to SCNO will provide improved service, they are raising a contention which this court rejects in its analysis of the evidence, which demonstrates how the grant of the proposed authority will aid SCNO in improving Missouri River service. It is true that with respect to the Mississippi River System no inadequacy of existing service was found. However, as we have previously indicated, the basic purpose of SCNO's grant—improvement of Missouri service—can only be accomplished by extending SCNO's authority to the waterways into which the Missouri River shippers' goods are commonly carried. The view of the plaintiffs would have this court hold, in effect, that the Commission could not authorize SCNO authority on the Mississippi or the Gulf Intercoastal in order to improve its service on the Missouri for the reason that the SCNO grant will not provide improvement of service on these waterways. Because the Commission is empowered to analyze the "total situation," United States v. Detroit & Cleveland Navigation Co., supra, to adopt plaintiffs' suggestion would be to disregard the inherent power of the I.C.C. in deciding matters of public convenience and necessity. *Nashua* was properly relied on by the Division in reaching its decision herein.

## X

### *The National Environmental Policy Act (NEPA) Question*

Following the issuance of the Commission's report and order in May, 1973, three of the plaintiffs (American Commercial, Dixie, and Union Mechling) raised for the first time in their petitions for reconsideration of the Commission's decision the argument that the I.C.C. had erred in deciding that its decision was not "major Federal action[s] significantly affecting the quality of the human environment" within the meaning of the National Environmental Policy Act (NEPA) of 1969, 42 U.S.C. § 4331 et seq. (343 I.C.C. at 420.) The Commission's threshold determination that its decision was not governed by this Act meant that it was therefore unnecessary for the Commission to prepare an environmental impact statement as § 102(2)(C), 42 U.S.C. § 4332(2)(C) of NEPA requires of all federal agencies

where the action is one which will significantly affect the quality of the human environment.

Prior to their petitions for reconsideration, the environmental issue had not been raised. The arguments of the three plaintiffs *re* the NEPA statement necessity have now been adopted by all the plaintiffs in this proceeding.

■ At the outset, it should be noted that this court's scope of review as to this issue is essentially the same limited review which governs our review of the merits of the Division's report. This court upon review of the agency's threshold determination of the necessity of a NEPA statement must examine the facts to determine whether the decision was arbitrary, capricious, or an abuse of discretion, and to decide whether the necessary procedural requirements were followed, and then determine de novo "all relevant questions of law." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Hanly v. Kleindienst, 471 F.2d 823, 829 (2d Cir. 1972) cert. denied 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

In its order denying the petitions for reconsideration, the Commission expanded on the reasons for its decision that a NEPA statement was not required: (1) the SCNO grant would not increase fuel consumption or commercial activity because the traffic will still require transportation (often by the plaintiff); and (2) the denial of the application by SCNO would have an adverse environmental impact inasmuch as (a) SCNO would more likely be compelled to operate tows on the Mississippi at less than peak capacity thereby wasting fuel, and (b) during the times when the barge shortage is acute, shippers and receivers (principally on the Missouri River) would be pressed to use more polluting forms of transportation (motor trucks) to move their goods.

■■ Two factors which an agency should normally consider in deciding whether a NEPA statement is required

are: "(1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by [the decision], and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area." See Hanly v. Kleindienst, supra, 471 F.2d at 830–831. Applying these two considerations to these proceedings, it appears that plaintiffs are advancing a procedural proposition which lacks any objective basis. The granting of the certificate to SCNO will not enable that carrier to travel on any rivers upon which it does not now travel as an unregulated carrier. As we previously noted, the certificate here addresses of course regulated water traffic, which all parties concede constitutes no more than 4% of the totality of tonnage moved on our inland waterways. Rather than serving new waterways, SCNO merely proposed to serve the same waterways more efficiently as a regulated as well as an unregulated carrier. It is difficult to imagine how this grant which would enable SCNO to more promptly and efficiently fill out tows, thereby conserving gasoline, could be viewed as detrimental to our environment in a time when the nation is seeking any new way in which to more efficiently consume its energy sources.

Plaintiffs argue that the Division's opinion denying the necessity for a NEPA statement was terse. It is accurate to note that the opinion was not lengthy. However, the statement was reasoned enough to allow the court to understand the process used by the Division in reaching its ultimate conclusion that an environmental impact statement was not required. Applying the appropriate standard of review, it cannot be said that this determination by the Commission was not in accordance with law or that it represents an arbitrary and capricious conclusion.

Plaintiffs refer to the case of Hanly v. Mitchell, 460 F.2d 640 (2d Cir.

1972)[13] to support their contention that the Division erred in not issuing an environmental impact statement. In Hanly v. Mitchell, supra, the appellate court decided that there was no error in the GSA's decision that a NEPA statement was not required for the construction of a nine-story, federal courthouse building in lower Manhattan. On the other hand, it was concluded that a NEPA statement should have been issued by the GSA for the construction of a jail-detention center in the same area of Manhattan. The court believed that the GSA had erred in failing to consider the impact of the jail on the surrounding residential environment. The matter was remanded with instructions to consider the probability that prison riots could occur which would adversely affect the immediate residential area.

If any adverse environmental impact could occur due to the SCNO grant, it would seem to be more closely related to the type of impact created by the construction of the courthouse in *Hanly*. The court in *Hanly* apparently recognized that construction of the courthouse in that area of Manhattan would have no adverse environmental effect on the immediate residential area which is already occupied by many other nine-story office buildings. Thus, by analogy, the grant of SCNO's application for more authority as a regulated carrier would not have any significantly adverse environmental impact because SCNO would be cruising the same waters it, and all unregulated carriers, have traveled. The only difference is that the load status of SCNO's tows would be changed to regulated commodities rather than unregulated, in certain instances. No increased adverse environmental impact would occur.

For the reasons as set forth, plaintiffs' NEPA contentions must be rejected. It cannot be said that the finding of the Commission was not properly made.

XI

*Was the Division's Decision Adequately Supported by a Statement of the Findings and Conclusions, and Reasons Therefor?*

This contention by plaintiffs is in many ways a reiteration of some of plaintiffs' other contentions which have been discussed. Plaintiffs' argument seems to be that the Division did not support its ultimate conclusions by appropriate subsidiary findings of fact and explanations. This contention is substantially based on plaintiffs' premise that, when Division One generally adopted the Administrative Law Judge's statement of fact, the Division also undertook an additional burden of explaining how it arrived at contrary conclusions.

The Division's opinion stated:

"We find the Administrative Law Judge's statement of the facts to be substantially correct in all material respects; and, as modified herein, we adopt that statement as our own. Only those facts necessary for clarity of discussion will be restated." 343 I.C.C. at 413.

Plaintiffs' brief refers the court to Northern Pacific Ry. v. United States, 241 F.Supp. 816 (D.Minn.1965) to support their proposition that the Division, having substantially adopted the statement of facts, was compelled to explain how it arrived at conclusions contrary to those of the Administrative Law Judge. In *Northern Pacific*, the District Court in Minnesota required the Commission to make a fuller explanation of its subsidiary findings, not because the I.C.C. reversed the Hearing Examiner's conclusions, but rather because the Commission had its original order on this matter annulled by another District Court in Northern California. After the Commission's original findings in *Northern Pacific* had been annulled by the first

---

13. Earlier is cited the case of Hanly v. Kleindienst, supra, which is an appeal of the decision reached by the district judge after the case was remanded by the Second Circuit in the above case of Hanly v. Mitchell, supra.

reviewing court, the I.C.C. did no more than reverse its prior holdings in general terms without any explanations for its reversal. It was in this context that the District Court in Minnesota ruled that the Commission's order lacked the requisite subsidiary findings.

More to the point is Caravelle Express, Inc. v. United States, 287 F.Supp. 585 (D.Neb.1968), where plaintiff made a similar argument urging that when the Commission adopted the Hearing Examiner's findings of fact, it undertook an additional burden of explaining how it arrived at a contrary conclusion. In *Caravelle*, the court noted that the applicable section of the APA (Administrative Procedure Act) governing the proceedings does not relegate the Commission to the role of a reviewing court, for that Act expressly confers upon the Commission the right to make its own determinations from the evidence (citing Morgan Drive-Away, Inc. v. United States, supra, 268 F.Supp. 886). Then the *Caravelle* opinion, after recognizing that the Commission had a duty imposed by the APA, 5 U.S.C. § 557(b) to state its findings and conclusions and to supply its reasons, concluded that there was no requirement that the Commission furnish "an analysis of each item" brought before it, nor to disclose "the mental processes" through which the decision was reached.

To the same effect is Braswell Motor Freight Lines, Inc. v. United States, 275 F.Supp. 98, 103 (W.D.Tex.1967) aff'd 389 U.S. 569, 88 S.Ct. 692, 19 L.Ed.2d 779 (1968):

"Plaintiff attaches great importance to the manner in which the Commission reversed the trial examiner. In the final analysis, it is the obligation and duty of the Commission to make its decisions and in so doing it is free to accept or reject the recommendations of its examiners. Administrative Procedure Act, Section 8(a), 5 U.S.C. § 557(c); Norfolk Southern Bus Corp. v. United States, 96 F. Supp. 756, 758 (E.D.Va.1950), affirmed, 340 U.S. 802 [71 S.Ct. 68, 95

L.Ed. 590]; Universal Camera Corp. v. NLRB, 1950, 340 U.S. 474, 496 [71 S.Ct. 456, 95 L.Ed. 456]"

Plaintiffs specifically point to two areas in which the Commission failed to adequately explain its reversal of the Administrative Law Judge's conclusions. First, the Administrative Law Judge in his report stated that the deficiencies in service on the Missouri were in part due to the "weather and navigational conditions which cannot be corrected by [the] grant of authority here. . . ." (Rec.Rep., p. 9.) Second, plaintiffs aver that the Division's order failed to specifically reject and explain away the Administrative Law Judge's finding that only in a rare instance would bulk shippers be willing to have these commodities travel in a regulated status. (Rec. Rep., p. 9.)

Considering that the Commission is not required to specifically explain away each finding of the Administrative Law Judge with which it does not agree, a cursory review of the Division's report indicates that improvement of transit time on the Missouri could be achieved by SCNO on the Missouri notwithstanding the physical limitations of the Missouri. Indeed, the realization by the Commission of the Missouri's natural and physical limitations was one of the very reasons why SCNO was granted such extensive authority on the Mississippi and Gulf Intracoastal Waterways. As previously noted, the basis for SCNO's grant was the Commission's intent to improve Missouri River barge service. Recalling that the Commission is not required to make formal or detailed findings of fact with respect to the evidence before it, so long as its report, read as a whole, discloses the essential basis of its judgment, Alabama G. S. R. Co. v. United States, 340 U.S. 216, 228, 71 S.Ct. 264, 95 L.Ed. 225 (1951), it cannot be said the Division inadequately explained the essential basis of its granting SCNO's application.

The argument that there was a failure to reject or explain away the Ad-

ministrative Law Judge's finding on the frequency of exempt commodities traveling in a regulated status has no merit. The Division's report explicitly rejects this finding, stating "contrary to the arguments of protestants, shippers of exempt bulk commodities would be willing to have their commodities move in a regulated status, and that they have done so in the past to a substantial extent." 343 I.C.C. at 419. Because the essential basis of the Division's report is clearly explained, the Commission is not obligated to point to the specific evidence in the record that causes it to reach a conclusion contrary to the Administrative Law Judge.

## XII

## CONCLUSION

As pointed out in the foregoing opinion, the findings of the Commission are supported by substantial evidence.

An appropriate order will be entered.